**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

LAURISSA RIGGINS,

Plaintiff,

v.

CHAD BUBLITZ, TYLER PYTLIK,
BENJAMIN ZIEGLER, and
CITY OF WAUWATOSA

Defendants.

# COMPLAINT AND JURY DEMAND

Plaintiff Laurissa Riggins, by her attorneys, Laster & Associates, alleges as follows:

## NATURE OF THE ACTION

1. On July 17, 2026, Laurissa Riggins was driving home from work when a Wauwatosa police officer stopped her. Her car windows had just been tinted, so she opened her driver's door to speak with the officer. By the time she left the scene, she was on a stretcher with a broken arm.
2. During the stop, Ms. Riggins proposed a way to let the officers finish their work: she would sit and wait in her car. The officers, instead, insisted that she sit on the curb. When she refused to sit on the curb, they reached for her arms and Officer Chad Bublitz grabbed her around the waist, tripped her, and threw her chest first onto the grass.
3. On the ground, Bublitz twisted Ms. Riggins's left arm behind her back. Officer Tyler Pytlik deployed his Taser, and Officer Ziegler held her feet. Bublitz threatened three times to snap her arm. Then he drove her already twisted arm upward and applied a sudden torque that fractured her left humerus.

4. The officers kept Ms. Riggins on the ground after she was handcuffed. She repeatedly told them she could not breathe and begged them to let her up. After firefighters arrived, the officers eased the restraint. They lifted her onto a stretcher, putting pressure beneath the broken arm. Once she was on the stretcher, Pytlik repeatedly pulled on that same arm while attempting to adjust her position. She screamed in pain each time.
5. Ms. Riggins brings this action under 42 U.S.C. § 1983 for the use of excessive force and the failure to intervene. She also brings a municipal liability claim against the City of Wauwatosa under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).
7. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Milwaukee County, within the Eastern District of Wisconsin.

## PARTIES

8. Plaintiff Laurissa Riggins is a Black woman who resides in Milwaukee County, Wisconsin. At the time of the incident, she worked as a Certified Nursing Assistant at St. Camillus Health System.
9. Defendant Chad Bublitz was a Wauwatosa police officer at the time of the incident. He initiated the traffic stop, took Ms. Riggins to the ground, and applied the hold that fractured her left arm. He is sued in his individual capacity.
10. Defendant Tyler Pytlik was a Wauwatosa police officer at the time of the incident. He participated in the ground restraint, deployed his Taser, and later pulled on Ms. Riggins's injured arm while she was on a stretcher. He is sued in his individual capacity.

11. Defendant Officer Benjamin Ziegler was a Wauwatosa police officer at the time of the incident. He participated in the ground restraint and assisted in lifting Ms. Riggins onto the stretcher. He is sued in his individual capacity.
12. Bublitz, Pytlik, and Ziegler were on duty, exercising police authority conferred by the City of Wauwatosa, and acting under color of state law at all times relevant to this action.
13. Defendant City of Wauwatosa is a Wisconsin municipality. The City operates the Wauwatosa Police Department, employs its officers, and is responsible for the policies, training, supervision, and practices governing their use of force.

## FACTUAL ALLEGATIONS

### The Traffic Stop

14. Shortly after 9:00 p.m. on July 17, 2026, Ms. Riggins was driving home from her shift at St. Camillus. She was the driver and sole occupant of a recently purchased Nissan Versa.
15. Bublitz stopped Ms. Riggins on West Wisconsin Avenue near North 55th Street. The department's subsequent review identified alleged speeding and a temporary registration issue as the reasons for the stop. When Ms. Riggins asked why he had stopped her, Bublitz told her that the temporary plate did not match the car. Ms. Riggins explained that she had recently purchased the vehicle at an out-of-state auction.
16. Ms. Riggins had recently had her windows tinted. Because the tint had just been applied, she could not roll down the driver's window. She opened the driver's door so she could speak with Bublitz.
17. Ms. Riggins gave Bublitz her driver's license. He returned to his squad to investigate the registration. While he was there, vehicles were passing around the squad and near Ms.

Riggins's open driver's door. While standing next to her car, she closed the door to get it out of the way of passing traffic.

18. Riggins then walked to the rear of her car. She tried to explain herself and asked to speak with a supervisor.

19. Pytlik and Ziegler arrived as backup. Dispatch records reviewed by the department place Pytlik's arrival at approximately 9:26 p.m. and Ziegler's arrival less than a minute later. Before the officers went hands-on, three white male officers were present with one smaller, unarmed Black woman during a traffic stop.

**The Officers Insisted She Sit on the Curb**

20. Pytlik repeatedly ordered Ms. Riggins to sit on the curb. She asked why she had to sit on the curb and told him she wanted to receive the citation and go home.

21. Ms. Riggins proposed the solution of sitting and waiting in her car while the officers completed the traffic stop. Her proposal gave the officers a way to resolve the disagreement about where she would wait and finish their investigation without using physical force.

22. The officers rejected her proposal. Pytlik told Ms. Riggins to sit on the curb or be put in handcuffs. When she again said she would not sit on the curb, Bublitz reached for her left arm and Pytlik reached for her right.

23. Before the officers reached for her arms, Ms. Riggins had questioned their repeated orders to sit on the curb and proposed sitting and waiting in her car. She had displayed no weapon, made no threat, and struck no officer. The officers' own reports described her refusal to sit on the curb as passive resistance.

24. As the officers reached for her arms, Ms. Riggins moved her right arm away from Pytlik's reach. Bublitz then wrapped his arms around her midsection, tripped her, and threw her chest first onto the grass.

**Bublitz Threatened to Snap Her Arm Three Times and Then Fractured It**

25. On the ground, Bublitz took hold of Ms. Riggins's left wrist and moved her left arm behind her back. Pytlik worked from her right side, and Ziegler held her feet.

26. Pytlik deployed his Taser twice while Ms. Riggins was on the ground. The department's review describes an initial connection lasting roughly one to two seconds and a second connection lasting approximately five seconds. Pytlik and Bublitz did not coordinate the Taser deployments with the force Bublitz was applying to Ms. Riggins's left arm. The second Taser shock compounded Ms. Riggins's pain as Bublitz continued applying pressure to her left arm, which he held twisted behind her back.

27. After the first deployment, Ms. Riggins was on her right side with Bublitz controlling her left arm. Bublitz used a figure-four hold that gave him leverage to apply rotational force to the arm he already controlled.

28. Bublitz reported that Ms. Riggins kicked at the officers. Detective David Cefalu, the department's lead defensive tactics instructor, reviewed Ziegler's body camera recording. Ms. Riggins's feet were visible during all but six seconds of the ground restraint leading up to handcuffing. Cefalu observed no kicks directed at officers in the visible footage. Ziegler was able to control her feet with one hand while using his other hand to operate his radio.

29. Although Ms. Riggins's right arm was not yet fully secured during part of the restraint, her visible hand held no weapon. Bublitz already controlled the left arm he was threatening to break, Ziegler controlled her feet, and Pytlik was beside her.

30. With Ms. Riggins on the ground and her left arm twisted behind her back, Bublitz said, “I’m going to snap your fucking arm.”

31. He repeated the threat. “I’m going to snap your fucking arm.”

32. He threatened her a third time. “Want me to snap your fucking arm!?”

33. Then Bublitz did what he had just threatened to do. With Ms. Riggins’s left wrist already locked in his grip and her arm twisted behind her back, he drove her hand upward toward her head. The sudden torque fractured her left humerus.




34. Ms. Riggins screamed and told the officers she was hurting. By the time they finished handcuffing her, she was on the ground with a broken arm.

35. Bublitz later acknowledged in his departmental interview that he rotated Ms. Riggins’s arm upward to inflict pain for compliance and applied enough torque to break it. Cefalu concluded that the officers already had a high degree of control over Ms. Riggins and that applying the hold as Bublitz did was likely to fracture her arm.

36. The department had trained its officers to work together to secure a person on the ground, including how to extract an arm and apply handcuffs. Neither Wauwatosa's defensive tactics training nor the state defensive tactics curriculum taught the figure-four maneuver as Bublitz applied it.

**The Officers Continued Holding Ms. Riggins Down After the Fracture**

37. After the officers handcuffed Ms. Riggins, all three continued to restrain her on the ground. Ziegler sat on her left leg, Pytlik applied pressure to her right ankle, and Bublitz continued to control her injured left arm. Ms. Riggins pleaded, "Please, sir, get off my ankles." She repeatedly told the officers she could not breathe, said she felt like she was going to pass out, and begged them to let her up.

38. The squad video, as described in the department's review, shows the officers moving Ms. Riggins onto her stomach at approximately 10 minutes and 53 seconds into the recording and holding her there until approximately 17 minutes and 57 seconds into the recording, when fire personnel had arrived and the officers were preparing her for transport.

39. The officers called for medical assistance. While they waited, Ms. Riggins remained prone and handcuffed, in visible distress and complaining that she could not breathe. Cefalu's review recognized that keeping a handcuffed person prone after two Taser deployments and an arm fracture could itself contribute to continued movement. Bublitz knew the arm was broken and told responding fire personnel so.

40. After fire personnel arrived, the officers asked Ms. Riggins whether she could remain calm so they could let her up. They then eased the restraint and stopped twisting her left arm. The officers' ability to release that pressure while keeping her in custody supports the inference that they could have eased the restraint earlier, when she first pleaded for relief.

**The Transfer to the Stretcher and Pytlik's Handling of the Broken Arm**

41. The officers lifted Ms. Riggins from the ground onto the stretcher instead of allowing her to stand on her own feet and move to it. Bublitz and Pytlik lifted her from beneath near her head and upper body, while Ziegler lifted her at her feet. As Bublitz and Pytlik raised her upper body, they lifted from beneath her fractured left arm, causing further pain. By then, Bublitz had already told responding fire personnel that the arm was broken.

42. Once Ms. Riggins was on the stretcher, Pytlik tried to adjust her position by pulling on the same fractured arm. Emergency medical personnel were present and attending to her.

43. Each time Pytlik pulled on her arm, Ms. Riggins screamed in pain. Pytlik continued pulling despite her screams and despite the officers' awareness that the arm was broken.

44. Pytlik could have stepped back and allowed emergency medical personnel to reposition Ms. Riggins and support her injured arm. His repeated pulling caused additional pain after she was already on the stretcher and in their care.

45. Milwaukee Fire Department Med 8 transported Ms. Riggins to Froedtert Hospital. Officers Ashley Trawicki and Patrick Baker accompanied her in the ambulance. Bublitz and Pytlik followed to the hospital. Sergeant Michael Leeman subsequently spoke with Ms. Riggins in the trauma room.

46. Ms. Riggins was arrested on suspicion of resisting an officer. The Milwaukee County District Attorney's Office declined to file charges. After reviewing the incident, the District Attorney's Office contacted the Wauwatosa Police Department to ensure that an administrative review of the use of force was underway.

**The Department's Review of the Fracture**

47. On July 22, 2026, five days after the incident, Ms. Riggins submitted a citizen complaint reporting that officers threw her chest first onto the grass, applied pressure to her body, used a Taser, and broke her arm.

48. Sergeant Jordan Yandre and Lieutenant Jacob Grosenick initially approved the force. Their review did not identify Bublitz's application of rotational force as improper, although Ms. Riggins sustained a broken arm during the restraint.

49. Captain Shane Wrucke disagreed with Grosenick's assessment and ordered further review. Cefalu reviewed the officers' reports, body camera recordings, squad video, dispatch audio, and training materials.

50. Cefalu concluded that Bublitz's application of the figure-four hold was unreasonable under the circumstances. He also found that the three officers did not verbally coordinate their tactics and that the simultaneous use of a Taser and the figure-four hold could work at cross purposes.

51. Deputy Chief Luke Vetter likewise concluded that Bublitz used an untrained, unjustified, and unreasonable technique that broke Ms. Riggins's arm. Vetter found that early-shift patrol supervisors failed to address the force properly through the existing review process. He recommended additional supervision, training, and review for substantial uses of force or those resulting in major injury.

52. In his October 2, 2026 draft disciplinary charges, Chief James H. MacGillis concluded that Bublitz used excessive force by applying a wrist-weave hold the department had not taught and increasing the pressure until Ms. Riggins's left humerus fractured.

**Injuries and Damages**

53. Ms. Riggins sustained a fracture of her left humerus. She required emergency trauma treatment, diagnostic imaging, immobilization, and orthopedic follow-up. She experienced substantial pain and limitations on her daily activities during her recovery.
54. Froedtert's billing records reflect $44,138.95 in gross charges for care rendered from July 17 through September 3, 2026. Ms. Riggins seeks the medical expenses recoverable under applicable law in an amount to be established by the evidence.
55. The fracture initially kept Ms. Riggins out of work as a Certified Nursing Assistant. When she returned after her physical recovery, ambulances, stretchers, and medical emergencies reminded her of the encounter and triggered anxiety and panic symptoms. Ms. Riggins reports that those symptoms interfered with her ability to do her job and led her to leave her employment in September 2026.
56. Ms. Riggins began outpatient psychotherapy on September 1, 2026, to address the distress she experienced after the encounter. She reported intrusive memories, nightmares, hypervigilance, difficulty sleeping and concentrating, and a diminished sense of safety. She described the restraint as humiliating and dehumanizing. Her treating clinician's assessment, which included standardized screening on November 5, 2026, documented severe psychological distress and supported a provisional diagnosis of post-traumatic stress disorder.
57. Her clinician recommended weekly trauma-focused psychotherapy for up to 12 months from the start of treatment, subject to periodic reassessment. Treatment addresses symptoms affecting her daily life and her ability to return to work. Ms. Riggins seeks recovery for past and reasonably necessary future care, lost earnings, physical pain,

emotional distress, and loss of enjoyment of life, to the extent established by the evidence.

**COUNT I**
**FOURTH AMENDMENT EXCESSIVE FORCE AGAINST CHAD BUBLITZ**

58. Ms. Riggins incorporates the preceding allegations.

59. Bublitz seized Ms. Riggins while acting under color of state law. The reasonableness of his force must be assessed under the totality of the circumstances, including the events leading up to each use of force.

60. Bublitz used objectively unreasonable force when he threw Ms. Riggins chest first onto the grass. The encounter began as a traffic stop. Ms. Riggins refused to sit on the curb and proposed that she sit and wait in her car while the officers finished the stop. She was unarmed, had made no threat, and had struck no one. When the officers reached for her arms, she moved her right arm away from Pytlik's reach. Under those circumstances, that movement did not justify Bublitz wrapping his arms around her waist and throwing her chest first to the ground.

61. Independently of the takedown, Bublitz used objectively unreasonable force when he deliberately increased the torque on Ms. Riggins's already controlled left arm until it fractured. At that point, Ms. Riggins was on the ground, Ziegler controlled her feet, and Pytlik was beside her. Her earlier movements did not justify the additional force Bublitz applied to that arm.

62. Bublitz also used objectively unreasonable force by continuing the painful restraint after the fracture while Ms. Riggins was handcuffed, cried out in pain, reported difficulty breathing, and repeatedly asked to be let up.

63. Bublitz's actions caused Ms. Riggins's fracture and resulting injuries. His repeated threats, followed by the deliberate application of the force he had threatened, support an award of punitive damages against him individually for reckless or callous indifference to Ms. Riggins's federally protected rights.

**COUNT II**
**FOURTH AMENDMENT EXCESSIVE FORCE AGAINST TYLER PYTLIK**

64. Ms. Riggins incorporates the preceding allegations.

65. Pytlik used objectively unreasonable force when he deployed his Taser a second time while Ms. Riggins was on the ground, Bublitz held her left arm twisted behind her back in a figure-four hold, and Ziegler held her feet. Pytlik deployed the Taser without coordinating with Bublitz to ease the pressure on her arm. The shock compounded her pain and increased the risk of injury while her arm remained under pressure.

66. After Ms. Riggins was handcuffed, Pytlik continued applying pressure to her right ankle to hold her down while she repeatedly said she could not breathe and pleaded to be let up. The nature and duration of that restraint were objectively unreasonable given that she was handcuffed, three officers were present to maintain custody, and she repeatedly reported pain and difficulty breathing.

67. Pytlik independently used objectively unreasonable force when he repeatedly pulled on Ms. Riggins's fractured left arm while she was on the stretcher. Emergency medical personnel were present and could reposition her and support her arm. Her screams made clear that each pull caused substantial pain. No safety or custody need justified continuing to pull on the arm.

68. Pytlik's conduct caused Ms. Riggins additional physical pain, emotional distress, and other injury.

**COUNT III**
**FAILURE TO INTERVENE AGAINST TYLER PYTLIK AND OFFICER ZIEGLER**

69. Ms. Riggins incorporates the preceding allegations.

70. Pytlik and Ziegler were in close proximity to Bublitz and Ms. Riggins while participating in the ground restraint. Pytlik was alongside Ms. Riggins, and Ziegler was holding her feet. From those positions, and on information and belief, each heard Bublitz threaten to snap her arm while he held it behind her back.

71. Bublitz made three threats before applying the torque that fractured the arm. On information and belief, the repeated warnings and the officers' proximity gave Pytlik and Ziegler a realistic opportunity to tell Bublitz to stop, direct him to release the hold, or otherwise interrupt the threatened use of force.

72. Neither officer intervened. They continued to participate in the restraint while Bublitz carried out his threat. Their failure to intervene contributed to Ms. Riggins's resulting injuries.

**COUNT IV**
**MUNICIPAL LIABILITY AGAINST THE CITY OF WAUWATOSA**

73. Ms. Riggins incorporates the preceding allegations.

74. Before July 17, 2026, the City of Wauwatosa began incorporating jiu-jitsu-based leverage and control techniques into its police training. The department taught wrist control and multi-officer ground restraint and distinguished basic control techniques from advanced submissions. Captain Shane Wrucke acknowledged that several officers were also

learning jiu-jitsu independently and that the department faced a challenge in ensuring officers understood how techniques learned outside the department fit within police defensive tactics.

75. In his administrative interview, Bublitz explained that he combined techniques from his private martial arts training with the department's newer leverage-based control techniques and his earlier pain-compliance training. Bublitz initially believed he was acting within his training and authority when he used the reinforced wrist weave and applied upward rotational pressure to Ms. Riggins's arm.

76. Under the City's Use of Force Policy 6.1.1, at least two supervisors, including a lieutenant, were required to review each use-of-force report. Sergeant Jordan Yandre and Lieutenant Jacob Grosenick initially approved the force used against Ms. Riggins. Grosenick classified the wrist weave as a "dynamic application of a trained technique," even though he identified the reinforcing grip as the part that differed from what officers were taught. That grip allowed Bublitz to use both arms to apply rotational force to Ms. Riggins's left arm.

77. The department's lead defensive tactics instructor, Detective David Cefalu, subsequently concluded that the reinforced wrist weave was a distinct jiu-jitsu technique that neither the department nor the state defensive tactics curriculum had taught. Deputy Chief Luke Vetter found that early-shift patrol supervisors had failed to apply the existing review process properly. In his October 2, 2026 draft disciplinary charges, Chief James MacGillis characterized the initial reviews as cursory and concluded that Bublitz's application of the untrained hold and his escalation of pressure to the point of fracture constituted excessive force.

78. Ms. Riggins alleges that, in implementing its jiu-jitsu-based training, the City failed to adequately train officers and their supervisors to distinguish a permissible variation of a trained control hold from the addition of an outside technique that materially increases the force and risk of injury. The risk arose where officers trained in both systems could combine them in the field and mistake a hold capable of producing a fracture for a permissible variation of ordinary wrist control. Ms. Riggins alleges that this risk was obvious during the rollout and that the City acted with deliberate indifference by failing to adequately address it. Bublitz's explanation and Grosenick's initial approval show how that distinction broke down in practice.

79. Ms. Riggins alleges that this training and supervision deficiency was a moving force behind the violation of her Fourth Amendment rights. Bublitz treated the reinforced wrist weave as an authorized control technique and increased the rotational pressure on her arm until her humerus fractured. As a result, Ms. Riggins sustained the physical, economic, and emotional injuries described above.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Riggins requests that the Court:

A. Enter judgment in her favor against the Defendants on the claims established at trial.

B. Award compensatory damages in an amount determined by the jury, including recoverable medical and counseling expenses, lost earnings, physical pain, emotional distress, and loss of enjoyment of life.

C. Award punitive damages against Chad Bublitz in his individual capacity.

D. Award reasonable attorney fees and costs under 42 U.S.C. § 1988 and other applicable law.

E. Award prejudgment and postjudgment interest as permitted by law.

F. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Ms. Riggins demands a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38.

Dated this 16th day of November, 2026

Respectfully submitted,

/s/ Corey Saffold
Corey Saffold
Bar # 1136889
Laster & Associates, LLC
839 N. Jefferson Street, Suite 310
Milwaukee, WI 53202
(414) 431-1195
cls@lasterlaw.com
*Counsel for Laurissa Riggins*